[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT #129
The issue here is whether the defendant's motion to set aside the jury verdict in favor of the plaintiff on the second count (negligence) of the fourth amended complaint should be granted on the grounds that the defendant owed no legal duty to the plaintiff, the plaintiff was contractually not entitled to recover expenses, and the evidence was insufficient to permit an award of compensatory damages.
The following facts were undisputed: On or about March 1, 1993, the CT Page 9172 plaintiff ("Ibamatic") and the named defendant ("UTI") entered into a sales representation agreement whereby Ibamatic would market helicopters and other products produced by the Sikorsky Aircraft Division ("Sikorsky") of UTI. The agreement contained payment terms which included commissions payable to Ibamatic for the sale of UTI products within Ibamatic's sales territory, the Republic of Venezuela, during the term of the agreement. Ibamatic worked for many months to position UTI's products for effective competition in the Venezuelan market, including arranging a visit by a Venezuelan military officer to the offices of Sikorsky in Stratford, Connecticut, one General Torres. On or about September 29, 1994 Ibamatic's principal, Sergio Batikoff ("Batikoff"), met for lunch with General Torres and an employee of Sikorsky, named Andre Simonpietri as part of an effort to market Sikorsky products to the Venezuelan Air Force. During the lunch, Batikoff made certain statements in Spanish to Simonpietri which Simonpietri construed as conveying a possible intent to use bribes to obtain orders. Shortly thereafter, on or about October 31, 1994, UTI terminated its sales representation agreement with Ibamatic, effective November 30, 1994, on the basis of the information which Simonpietri brought to its attention concerning the alleged intent to bribe. No Sikorsky products were sold in Venezuela prior to November 30, 1994. Subsequently, Sikorsky marketed its products to the government of Venezuela but did not appoint a new sales representative.
The following facts that Ibamatic alleged were subject to proof at trial. Ibamatic alleged that UTI canceled the agreement without warning and without good cause; that UTI refused to reinstate the agreement despite objection by Ibamatic; that UTI was aware, at the time of the cancellation, that the Venezuelan Armed Forces was planning imminently to call a bid for 18 helicopters, and that the prior marketing efforts of Ibamatic could result in substantial helicopter sales by UTI to that entity; that, if the agreement remained in effect, it required UTI to pay substantial commissions to Ibamatic as a result of such sales; that it canceled the agreement with the desire and intention to avoid paying such commissions; that during the conversations between Batikoff and Simonpietri it was apparent that the latter's command of the Spanish language was generally poor; that, in his report to UTI, Simonpietri falsely accused Batikoff and Ibamatic of soliciting funds from UTI to bribe Venezuelan officials to buy helicopters; and that UTI terminated the agreement as a result of this report.
In the second count of the complaint Ibamatic alleged that UTI owed a duty to use reasonable care in its dealings with Ibamatic by virtue of their agreement and by virtue of their long term sales relationship; that UTI breached this duty in that it "negligently failed to 1) properly investigate the claims made by Simonpietri, 2) consider his poor Spanish language skills, and 3) consider the explanations of Batikoff, in making CT Page 9173 a decision to terminate the agreement[1] and that as a direct and proximate" result of this negligence Ibamatic suffered damages.
UTI argues that it is entitled to judgment in its favor on the negligence count because (i) it owed Ibamatic no legal duty, and (ii) Ibamatic failed to adduce evidence of damages on which the jury could base its award.
The "standard of review for motions to direct a verdict, motions to set aside a verdict and motions for judgment notwithstanding the verdict are the same." Medcalf v. Washington Heights Condominium Assn., Inc.,57 Conn. App. 12, 15 n. 2 (2000). "[A] motion for judgment notwithstanding the verdict is not a new motion, but the renewal of a motion for a directed verdict." Gagne v. Vaccaro, 255 Conn. 390, 400
(2001). "Directed verdicts are not favored." Godwin v. Danbury EvePhysicians Surgeons, P.C., 254 Conn. 131, 135 (2000).
"A court is empowered to set aside a jury verdict when, in the court's opinion, the verdict is contrary to the law or unsupported by the evidence. . . . A verdict should not be set aside, however, where it is apparent that there was some evidence on which the jury might reasonably have reached its conclusion. . . . Before determining whether the granting of a motion to set aside is proper, the trial court must look at the relevant law that it gave the jury to apply to the facts, and at the facts that the jury could have found based on the evidence. The law and evidence necessarily define the scope of the trial court's legal discretion. . . . This discretion vested in the trial court is not an arbitrary or capricious discretion, but, rather, it is legal discretion to be exercised within the boundaries of settled law. . . . This limitation on a trial court's discretion results from the constitutional right of litigants to have issues of fact determined by a jury. . . . The trial court, upon a motion to set aside the verdict, is called on to question whether there is a legal reason for the verdict and, if there is not, the court must set aside the verdict." (Citations omitted; internal quotation marks omitted.) PAR Painting, Inc. v. Greenhorne O'Mara,Inc., 61 Conn. App. 317, 322-23 (2001).
The court must first look at the relevant law that it charged the jury to apply to the facts. UTI argues that the instruction the court gave to the jury was erroneous in that contrary to the law of Connecticut it charged the jury that it had a duty to Ibamatic independent of its duty to act fairly and in good faith. In fact, the court instructed the jury that "UTI and Mr. Simonpietri owed the plaintiff the duty to use reasonable care in their contractual dealings with the plaintiff." UTI argues that it owed Ibamatic no legal duty to conduct any investigation, and that, in the absence of such a duty, there can be no negligence. CT Page 9174
"The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand. . . . We have stated that the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendants position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case. . . . The first part of the test invokes the question of foreseeability, and the second part invokes the question of policy." Gazo v. Stamford, 255 Conn. 245, 250 (2001). "Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual." Lombard v.Edward J. Peters, Jr., P.C., 252 Conn. 623 (2000).
Our Supreme Court has previously held that liability in negligence may arise out of a contractual relationship. See Dean v. Hershowitz,119 Conn. 398, 405-07 (1935); Gazo v. Stamford, supra at 245. In Dean v.Hershowitz the court explained that "the duty to exercise reasonable care arises whenever the activities of two persons come so in conjunction that the failure to exercise that care by one is liable to cause injury to the other." Dean v. Hershowitz, supra at 408. The court further stated that when one "has assumed the performance of an act which may affect the rights of another under such circumstances that, unless he uses proper care, that other will suffer injury, . . . the law law imposes or implies a duty to use such care." Id., 409. Thus, "[i]f a man will set about actions attended with risk to others, the law casts on him the duty of care and competence. It is . . . immaterial that the defendant may have bound himself to do the act, or to do it competently. The undertaking, if undertaking there was in that sense, is but the occasion and inducement of the wrong. . . . It is in this sense that negligence grows out of contracts. . . ." Ibid.
In other words, where the elements of negligence are present the fact that the "precedent relationship . . . is one of contract is no sound reason why the action should not lie." Id. (Emphasis added.) Furthermore, "[a] party may be liable in negligence for the breach of a duty which arises out of a contractual relationship . . . [e]ven though there may not be a breach of contract. . . ." Johnson v. Flammia,169 Conn. 491, 496 (1975). CT Page 9175
UTI argues that its contractual relationship with Ibamatic was akin to an at will employer-employee relationship. Relying on employer-employee cases, it argues that it did not have a duty to Ibamatic because Connecticut does not recognize claims arising from negligence in the termination of an at will employee absent a narrow public policy exception arguably inapplicable to the negligent investigation of a matter. See Morris v. Hartford Courtant Co., 200 Conn. 676, 678-80
(1986). Ibamatic argues that UTI's cases are inapposite because the parties' relationship was not that of employer-employee but a business relationship based on an arms length commercial contract, and therefore a violation of a public policy is not a required element. It argues that commercial contract cases are relevant, and that Connecticut has not narrowed the scope of tort claims based on a contractual relationship between commercial parties.
Ibamatic's position on this issue is supported by the express language of the contract, which provides that "the Representative [Ibamatic] agrees to act only as an independent contractor. . . ." In addition, it is supported by the fact that UTI only required Ibamatic to use its best efforts to obtain purchasers for its products, leaving the methods and means substantially under Ibamatic's control. Although Ibamatic was required to submit periodic and quarterly reports to UTI, it was not required to report its day-to-day activities. The requirement of submitting periodic reports is not inconsistent with the functions of an independent contractor, because partial reservations of control do not prevent the existence of a relation of contractee and independent contractor. See Norwalk Gaslight Co. v. Norwalk, 63 Conn. 495, 524 (1893) (finding independent contractor even where contract provisions denoted that high degree of supervision was reserved by principal); Latimer v.Administrator, 216 Conn. 237, 251 (1990) (reporting of day-to-day) activities supports finding of employee, rather than independent contractor). Furthermore, Ibamatic is a foreign corporation engaged in a distinct occupation and doing work of the type not subject to the direction of UTI in the particular locality where it was active. Finally, UTI did not supply the place of work for the persons performing the job, the method of payment was by commission, not by the time, and the work done by Ibamatic was not part of the regular business of UTI and Sikorsky, their regular business being the manufacture of aircraft. See 1 Restatement (Second) Agency § 220; Robert C. Buell Co. v. Danaher,127 Conn. 606, 610 (1941) ("Various elements may enter into the determination of the question whether one who performs services for another is his servant or is exercising an independent employment. Restatement, 1 Agency, § 220. The many decisions on this subject are determined by the facts of the particular situations presented, and sometimes one and sometimes another fact has been regarded as of predominating weight."). The court finds that there is sufficient evidence CT Page 9176 to warrant the conclusion that Ibamatic was an independent contractor. Consequently, it agrees with Ibamatic that employer-employee cases are inapposite, and that it does not need to satisfy the narrow public policy exception applicable in such cases. See Kozera v. Connecticut MotorClub, Inc., Superior Court, judicial district of Fairfield at Bridgeport Docket No. 315537 (April 25, 1996, Hauser, J.). (16 Conn.L.Rptr. 510, 511) ("The public policy exception appears to be applicable exclusively to employment contract cases. . . . Here, the contract at issue is not for employment but rather for an independent contractor. . . . Accordingly, the public policy exception is not applicable.")
UTI also argues that the court"virtually" instructed the jury that contrary to Connecticut law it had a duty to Ibamatic independent of its duty to act fairly and in good faith. To the extent this argument raises the question whether UTI had a duty to investigate Simonpietri's claims under the original agreement, the court considers it irrelevant.
First, even if UTI did not originally have a contractual duty to investigate Simonpietri's claims, once it undertook to investigate the claims[2] it "changed its position with reference to [Ibamatic]."Gianetti v. Norwalk Hospital, 211 Conn. 51, 62 (1989). By investigating the claims UTI changed its position "in doing something [it] was not previously bound to do. . . . Therefore, there [was] a contractual relationship between [UTI and Ibamatic];" id., 63; because the duty to investigate had "become "an enforceable part of the contract' between [UTI and Ibamatic]." Id.; see Dean v. Hershowitz, supra,119 Conn. 409.[3]
Second, even if the duty to investigate did not arise contractually, once UTI undertook to investigate the claims of Simonpietri, it had to act with reasonable care.[4] It is a recognized principle of Connecticut law that one who gratuitously undertakes an act will be liable for performing it negligently." Coville v. Liberty Mutual Ins.Co., 57 Conn. App. 275, 281, 748 (2000). "One who gratuitously undertakes a service that he has no duty to perform must act with reasonable care in completing the task assumed." Id. at 282. "If one undertakes to perform an act and performs it negligently . . . it makes no difference whether the motive leading to the performance of the act was the carrying out of a contractual obligation or whether the act was performed gratuitously and without compensation." Zatkin v. Katz, 126 Conn. 445, 450 (1940) (holding that jury charge that company was not liable if its acts were voluntary but liable if its acts were the result of contract was incorrect). Thus, even if the court's instruction "virtually" instructed the jury that UTI had a duty to Ibamatic independent of its duty under the contract to act fairly and in good faith, the result was not contrary to the Connecticut law.[5]
CT Page 9177
Having found that a legal duty existed, and that the court's instruction was correct, the next step in the analysis is to determine whether the evidence reasonably supports the jury's findings regarding damages. UTI argues that Ibamatic failed to adduce evidence of damages on which the jury could have based its award. As stated previously, a verdict should not be set aside where it is apparent that there was some evidence on which the jury might reasonably have reached its conclusion. See PAR Painting, Inc. v. Greenhorne O'Mara, Inc., supra at 322. The trial court must look at the facts that the jury could have found based on the evidence. See id., 322-23.
The jury could have found that Ibamatic was entitled to one hundred thousand dollars in compensatory damages based on the lost opportunity to try to sell helicopter parts and helicopters to the Venezuelan government and to earn commissions. "[T]he guiding principle of tort law is to compensate parties for harm to their protected interests. . . ." BeverlyHills Concepts, Inc. v. Schatz and Schatz, Ribicoff Kotkin, 247 Conn. 48,64 (1998). "[W]e have approved the recovery of lost profits where the defendant has destroyed the plaintiff's opportunity to earn profits in the future." Id., 66. "[S]uch damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty." (Emphasis omitted.) Id., 69.
In the present case, there was sufficient evidence in the record for the jury to estimate the value of Ibamatic's lost opportunity. The record contains a memo, written by Richard Flynn, UTI's Director of Contract Representation, regarding a proposed amendment to the sales representation agreement between UTI and Ibamatic. The document states that projected sales of spare parts by Ibamatic would amount to $1 million to $1.7 million per year, generating commission increases to Ibamatic of $30 thousand to $50 thousand per year. Where a plaintiff's evidence regarding future profits has been prepared by the defendant the evidence is usually sufficient to form a reasonable basis for the jury to estimate or calculate damages. See Beverly Hills Concepts, Inc. v. Schatzand Schatz, Ribicoff Kotkin, supra at 74-75 (citing Super Valu Stores,Inc. v. Peterson, 506 So.2d 317, 330 (Ala. 1987)).
Furthermore, Mr. Batikoff testified that Ibamatic's out of pocket expenses were $78,500. Mr. Flynn, Mr. Perez and Mr. Bougie all acknowledged at trial that Ibamatic expended considerable sums in its marketing efforts on behalf of UTI.
Additionally, Ibamatic argues, and the court agrees, that the jury reasonably could have found that it was reasonably probable that Ibamatic would have completed some sales of helicopters to Venezuela within a year CT Page 9178 after the agreement was terminated. The opportunity to try had value to Ibamatic. Ibamatic produced evidence that in the hierarchy of approvals from Venezuelan officials for a helicopter sale, the approval of the Minister of Defense was the most difficult to obtain; and that after months of work for UTI, Mr. Batikoff finally reached the level of the Minister of Defense, who sent his representative, General Torres, to the Sikorsky plant for the 1994 meeting. Subsequently, General Torres wrote a letter to UTI's James White that stated that he could write "a highly favorable report" to the Minister, and that "in the near future [the Venezuelan] Armed Forces could have the Sikorsky helicopters as an operational equipment due to its operational performance and outstanding capacity achieved the mission" (Sic). Mr. Batikoff testified that this letter indicated that UTI was the favored candidate for the next helicopter sale in Venezuela, and that the next step in Ibamatic's marketing plan was to obtain a signed contract.
Further evidence that the lost opportunity to sell helicopters had value came in the form of testimony by Mr. Batikoff to the effect that the Venezuelan Armed Forces spent around $275 million on helicopters since UTI terminated the contract with Ibamatic, and that Sikorsky's helicopters were highly competitive with the successful companies' products in each of these sales. See Beverly Hills Concepts, Inc. v.Schatz and Schatz, Ribicoff Kotkin, supra, 247 Conn. 73-74 (citing with approval opinions holding it proper to base future profit calculations on experience of third parties conducting virtually identical business at same location, and approving reliance on experience of others in same line of business as injured party as a method of proving lost profits). With regard to these sales, UTI conceded that absent a bid on a tender or request for proposal Ibamatic's opportunity to sell would not have value. It also conceded, however, that the evidence established that UTI bid in two of the five sales made by other companies. Therefore, UTI conceded that Ibamatic's opportunity to sell aircraft had value.
The record is replete with evidence that Venezuela had a continuous and abiding interest in purchasing helicopters from Sikorsky as a result of Ibamatic's efforts. For example, exhibit K ("The Venezuelan National Guard has expressed a strong interest in aquiring 4 utility S-70 helicopters beginning in their 1993 budget cycle") (see also July 25, 2001 Transcript, at 17-18); exhibit S ("[W]e are interested in the possibility of using the series H-60 helicopters"); exhibit T (invitation to bidding process for acquisition of four helicopters) (see also July 24, 2001 Transcript, at 43-44); exhibit X ("The interest for the UH-60 is still standing"); exhibit Y ("[T]he force still wants our UH-60"); exhibit GG ("[T]here is a serious analysis for the acquisition of the first squadron of 12 Blackhawks"); exhibit TT ([T]he representative of the military group had expressed to Mr. White and me, from the Chief CT Page 9179 General, Chief Logistic and his staff, Chief Airborne and others that had interest in the acquisition of UH-60"); exhibit UU(3) ("An interest in the National Guard was created in order to acquire a group of helicopters for a special missions" (sic)); exhibit ZZ ("bids that are currently under way, and for those about to come . . . allow us to act as your advisors, so that we may help you win this bid"); exhibit JJJ ("[Sikorsky] in competition with Superpuma . . . [Venezuelan] Air Force has had bad experience with Superpuma . . . Chief of Procurement of Air Force . . . said he needs contract by end of year and doesn't think Sikorsky can do it alone . . . [Venezuelan] Air Force contacted US Embassy to get Sikorsky contact"); exhibit BBBB ("I was pleased to receive your letter advising me of your interest in the purchase of ten (10) Black Hawk helicopters . . . [W]e have established an excellent relationship that will become the basis of a mutually beneficial helicopter program in the near future . . . For your planning purposes budgetary price estimates for an international utility Black Hawk to be delivered in 1994 is 9.6 million U.S. Dollars") (see also July 24, 2001 Transcript, at 42-43); exhibit CCCC ("[T]here is some significant activity going on concerning helicopter programs in the [Venezuelan] army and the national guard"); and exhibit DDDD ("The Venezuelan Government is in the process of . . . [purchasing] three S-70 helicopters. . . . The price of the FMF package will be 40 to 45 million Dollars. Desired deliveries would be 4th quarter 1994 but the first half of 1995 is more likely").
Taken together, this evidence supports the premise that it was more probable than not that Ibamatic would have completed some sales of helicopters to Venezuela within a year after the agreement was terminated, and that the lost opportunity to try had value to Ibamatic. "[W]e ordinarily leave . . . difficult questions of damages to the jury's ability to sort out the appropriate limits under proper instructions from the court." Mendillo v. Board Of Education, 246 Conn. 456, 489 (1998). "A damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence." Beverly Hills Concepts,Inc. v. Schatz and Schatz, Ribicoff Kotkin, supra at 70.
Based on the evidence and testimony of Ibamatic's expenses, commissions on the projected sales of spare parts, and commissions on the probable future sale of some helicopters, the jury could reasonable find that Ibamatic was entitled to one hundred thousand dollars in compensatory damages because of the lost business opportunity. Where there is "no breakdown of the components of the verdict, it would be error to set it aside." Olynciw v. Stop Shop Companies, 67 Conn. App. 773, 775 (2002). "We cannot speculate as to how the jury reached its figure. . . . [The jury was] at liberty to accept what part of [the evidence it] chose and factor [that evidence] into [its] total calculations." Barrows v. J.C.CT Page 9180Penney Co., 58 Conn. App. 225, 229-30 (2000).
UTI also argues that it was error for the court to instruct the jury that it could award damages through February 1996, but not beyond that point, based on an assumption that the agreement with Ibamatic would have been renewed for one additional year. There is, however, evidence in the record that UTI would have renewed Ibamatic's agreement. In computer notes of Thomas Johnson, Jr., outside counsel to UTI, regarding conversations with Jim White, Director for International Marketing of Sikorsky, Johnson writes that White confirmed that the agreement with Ibamatic would have been renewed if the affair with Simonpietri had not come up. This evidence reasonably supports the assumption that the agreement would have been renewed. Although there was conflicting evidence, "[t]he jury is entrusted with the choice of which evidence is more credible and what effect it is to be given." Hackling v. CasbroConstruction of Rhode Island, 67 Conn. App. 286, 295 (2001).
UTI also argues that Ibamatic's damages should have been limited to the un-expired term of the agreement and that it could not claim lost commissions beyond the agreement's February 28, 1995 expiration date. In support of this argument it cites Beverly Hills Concepts, Inc. v. Schatzand Schatz, Ribicoff Kotkin, supra, 247 Conn. 48, for the proposition that "[w]here a lost business opportunity is grounded in a contract . . ., it is sometimes appropriate to award damages for a period commensurate with the term of that contract. . . ." Id. at 76. That same case holds, however, that "[w]here the claimed damages are not the result of a breach of contract . . ., damages for future losses are permitted as long as they are limited to a reasonable time and are supported by the evidence." (Emphasis omitted; internal quotation marks omitted.) Id. In the present case, we are concerned with damages based on negligence, not a breach of contract. Therefore, Ibamatic's damages were not limited to the un-expired term of the contract. Furthermore, the damages were limited to a reasonable time, and supported by the evidence.
Finally, UTI argues that the evidence of Ibamatic's expenses, about $78,500, was not a proper basis for the jury to award damages because Ibamatic was not contractually entitled to reimbursement for expenses. Ibamatic argues that UTI cannot seek judgment notwithstanding the verdict on this ground because UTI did not raise it in its motion for a directed verdict.
"The rules of practice establish a procedure pursuant to which a motion for directed verdict, if denied, is considered renewed by the motion for judgment notwithstanding the verdict. . . . Section [16-37] of the Practice Book provides for a motion for judgment notwithstanding the verdict "in accordance with [the party's] motion for a directed CT Page 9181 verdict'. . . . The purpose of the motion for directed verdict with respect to the motions to set aside and for judgment notwithstanding the verdict is to give notice to the trial court." Salaman v. Waterbury,246 Conn. 298, 309 (1998).
The court has carefully studied UTI's motion for, and memorandum in support of, a directed verdict and agrees with Ibamatic that UTI did not raise this ground and did not "adequately alert Ibamatic and the court to the fact that this issue would be raised in the present motion. Accordingly, UTI is precluded from relying on this argument as the basis for a judgment notwithstanding the verdict.[6]
 CONCLUSION
For the foregoing reasons the motion for judgment notwithstanding the verdict is denied.
BY THE COURT,
Mottolese, Judge